**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CYNTHIA D. MAESTAS,

        Plaintiff - Appellant/
Cross - Appellee.

    v.

NESTOR LUJAN,

        Defendant - Appellee/
Cross - Appellant,

and

STATE OF COLORADO,
DEPARTMENT OF REVENUE,

        Defendant.

Nos. 01-1464 and 01-1489

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 99-N-608)**

---

Patricia S. Bangert, Powers Phillips, P.C., Denver, Colorado, appearing for Plaintiff-Appellant/Cross-Appellee.

Alan Epstein, Hall & Evans, L.L.C., Denver, Colorado (Joyce L. Jenkins, Hall & Evans, L.L.C., Denver, Colorado, and George S. Meyer, Esq., Special Assistant Attorney General, Office of the Attorney General, Denver, Colorado, with him on the brief), appearing for Defendant-Appellee/Cross-Appellant.

Before **TACHA**, Chief Circuit Judge, **ANDERSON**, and **BRISCOE**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

In the district court, Plaintiff-Appellant Cynthia Maestas brought Title VII, § 1983, and outrageous-conduct tort claims alleging sexual harassment. On appeal, Ms. Maestas argues that: (1) the district court improperly sent Defendant-Appellee Nestor Lujan's affirmative defense of qualified immunity to the jury, (2) the district court erred in the substance of its qualified immunity jury instruction, and (3) the district court erred in the substance of its § 1983 jury instruction. On cross-appeal, Mr. Lujan argues that, in relation to the tort of outrageous conduct, the district court erroneously applied the continuing violation doctrine to cure Ms. Maestas's failure to file timely notice as required by the Colorado Governmental Immunity Act. We **AFFIRM** the determination of the district court to send the qualified immunity issue to the jury and the jury instructions themselves, **REVERSE** the application of the continuing violation doctrine to the outrageous conduct claim, and **REMAND** with instructions to conduct a factual inquiry as to whether Ms. Maestas complied with the Colorado Governmental Immunity Act notice provisions.

## I. Background

In February 1992, the Colorado Department of Revenue ("the Department")

hired Ms. Maestas as a driver's license examiner in the Austin Bluffs Regional Office. In August of that year, the Department promoted Ms. Maestas to the Commercial Driver's License Compliance Division. Mr. Lujan served as the Regional Director for the Austin Bluffs Region.

According to Ms. Maestas, Mr. Lujan was her supervisor prior to her August promotion, and the Commercial License Program Coordinator, Jim Kilgore, was her formal supervisor after the promotion. Despite Mr. Kilgore's intermediate position in the chain of command, Ms. Maestas contends that Mr. Lujan continued to supervise her until January 1994, when the Department transferred her to the Security Office, and that his supervision continued on a periodic basis until May 1998. Mr. Lujan responds that he never supervised Ms. Maestas.

In late 1992, Mr. Lujan began expressing sexual interest in Ms. Maestas. According to Ms. Maestas, until his reprimand in May 1998, Mr. Lujan continuously made offensive, sexually oriented comments to her, touched her inappropriately, and leered at her. Moreover, in late 1992, he forcibly kissed Ms. Maestas following an after-hours gathering with coworkers. In February 1993, Mr. Lujan told Ms. Maestas he was in love with her and wrote her letters to that effect. In December 1997, while at an official meeting in Denver with Ms. Maestas, Mr. Lujan repeatedly requested that she spend the evening in his hotel

room.  In March 1998, Mr. Lujan ordered Ms. Maestas to accompany him on a business trip to Hugo, Colorado.  On the return trip, Mr. Lujan purposely took a long route home and attempted several times to "pull off the road" with Ms. Maestas.  Following her rebuffs, Ms. Maestas alleges that Mr. Lujan wrote offensive comments on her car and left upsetting messages on her voice mail.  Mr. Lujan denies these allegations.  Instead, he contends that he had a consensual sexual relationship with Ms. Maestas for four months in 1993 and denies all of the alleged offensive conduct.

Ms. Maestas states that she repeatedly complained to Mr. Kilgore about Mr. Lujan's conduct beginning in 1993, although Mr. Kilgore took no action until April 1998.  At that time, the Department conducted an investigation and issued a reprimand to Mr. Lujan.

On August 18, 1998, Ms. Maestas filed a charge of discrimination with the Equal Employment Opportunity Commission.  She later received a right-to-sue letter and filed a complaint in the District of Colorado.  In her complaint, Ms. Maestas brought an action pursuant to 42 U.S.C. § 2000e ("Title VII") against the State of Colorado alleging sexual harassment, an action pursuant to 42 U.S.C. § 1983 ("§ 1983") against Mr. Lujan alleging sexual harassment, and an outrageous-conduct tort claim against Mr. Lujan.

In his Answer, Mr. Lujan pleaded qualified immunity as an affirmative

defense to the § 1983 claim. To determine whether a plaintiff can overcome a qualified immunity defense, courts decide (1) whether the plaintiff has asserted a violation of a constitutional or statutory right, (2) whether that right was clearly established (3) such that a reasonable person in the defendant's position would have known that his conduct violated that right. *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996). Given the highly contested nature of material facts, the district court presented the final prong of the qualified immunity defense—the reasonableness element—to the jury.

In addition to his qualified immunity defense, Mr. Lujan, in two separate motions to dismiss and in a motion for judgment as a matter of law, argued that the Colorado Governmental Immunity Act barred Ms. Maestas's tort claim because she failed to comply with its notice provisions. The district court denied these motions, holding that the continuing violation doctrine cured Ms. Maestas's untimely filing of notice.

The district court then conducted a jury trial. Although Ms. Maestas challenges several jury instructions on appeal, she did not object to them at trial. The jury found for the defendants on the Title VII and § 1983 claims, but for Ms. Maestas, in the amount of $37,500.00, for her outrageous-conduct tort claim against Mr. Lujan.

Ms. Maestas brings three issues on appeal. First, she contends that the

district court erred in submitting the qualified immunity issue to the jury. Second, she argues that even if it was not error to submit the qualified immunity issue to the jury, the instruction itself was substantively erroneous. Third, she asserts that the § 1983 instruction was substantively erroneous.

Mr. Lujan, on cross-appeal, argues that, subsequent to the district court's ruling, the Colorado Supreme Court held that the continuing violation doctrine does not apply to the notice provisions of the Colorado Governmental Immunity Act. He asserts that the district court, therefore, erred in employing the doctrine. We take jurisdiction pursuant to 28 U.S.C. § 1291 and address these four issues in turn.

## II. Discussion

A.    Sending The Qualified Immunity Defense To The Jury

The district court properly sent the qualified immunity issue to the jury. We review de novo a district court's ruling on qualified immunity. *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a plaintiff can overcome a qualified immunity defense, we first "determine whether the plaintiff has asserted a violation of a constitutional or statutory right, and then we decide whether that right was clearly established such that a reasonable person in the

defendant's position would have known that [his] conduct violated that right."
*Garramone*, 94 F.3d at 1449. Order is important; we must decide first whether
the plaintiff has alleged a constitutional violation, and only then do we proceed to
determine whether the law was clearly established. *Saucier v. Katz*, 533 U.S. 194,
200 (2001).

Although issues of qualified immunity normally are questions of law
decided prior to trial, in exceptional circumstances historical facts may be so
intertwined with the law that a jury question is appropriate as to whether a
reasonable person in the defendant's position would have known that his conduct
violated that right. *Walker v. Elbert*, 75 F.3d 592, 598 (10th Cir. 1996) (qualified
immunity issues may be sent to the jury under special circumstances); *see also*
*Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) ("The
objective legal reasonableness of the [defendant's] actions is a legal question[,]
[b]ut where the historical facts material to that issue are in dispute there is an
issue for the jury." ) (quotations omitted) (internal citations omitted). But even
under such special circumstances, whether plaintiff's claim asserts a violation of a
constitutional right and whether this right was clearly established at the time
remain questions of law. *See Walker*, 75 F.3d at 598 (limiting jury issue to
question of reasonableness of defendant's actions).

We do not read *Roska* as providing an exclusive set of circumstances of

when objective legal reasonableness properly poses a jury question. *Roska*, 328 F.3d at 1251 ("In considering the 'objective legal reasonableness' of the state officer's actions, *one relevant factor* is whether the defendant relied on a state statute . . . .") (emphasis added). *Roska*, then, falls in line with several other circuit courts, which hold that a contested issue of fact that is material to the qualified immunity analysis gives rise to a jury question.

In *Catone v. Spielmann*, 149 F.3d 156 (2d Cir. 1998), plaintiff brought a § 1983 claim for violations of her First and Fourteenth Amendment rights after she was terminated from her employment in the New York State Department of Environmental Conservation following a gubernatorial change. In that case, plaintiff was discharged without a hearing, an act deemed legal only if she was a 'deputy.' *Id*. at 160. The parties hotly contested whether plaintiff was actually a deputy. *Id*. at 161. Given this background, the Second Circuit held that "the issue of qualified immunity turn[ed] on the answers to the following [factual] questions: (1) was [plaintiff] a deputy; and (2) would a reasonable officer in [defendant's] shoes have believed [plaintiff] was a deputy." *Id*. at 160. The Second Circuit affirmed "the trial judge['s] reject[ion of] defendant's contention that the plaintiff's evidence is insufficient to create a jury issue." *Id*. (internal quotations omitted).

Similarly, in *Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000),

plaintiff brought a § 1983 claim, alleging Fourth Amendment violations, after a police officer shot her while she was driving. "[T]he district court had ruled that the factual dispute as to the behavior of the car driven by [plaintiff] as it approached [Officer] Taylor[, who claimed the car was driven threateningly,] prevented the granting of summary judgment on the issue of qualified immunity." *Id*. at 317. The Sixth Circuit held:

> Where, as here, the legal question of qualified immunity turns upon which version of facts one accepts, the jury, not the judge, must determine liability. In this case, the district court charged the jury to consider whether Officer Taylor's use of deadly force had been objectively unreasonable; that is, to resolve the continuing factual dispute as to the car's behavior as it came towards Officer Taylor. There was no error in such instructions. *Id.* (citation omitted).

Although courts often emphasize that qualified immunity is effectively lost if the case goes to trial, see *Mitchell*, 472 U.S. at 526, pursuing qualified immunity during trial is not pointless. To the contrary, "the doctrine of qualified immunity shields a defendant both from trial *and from damages*." *Guffey v. Wyatt*, 18 F.3d 869, 873 (10th Cir. 1994) (emphasis added). In *Guffey*, we noted that "'the right not to pay damages and the right to avoid trial are distinct aspects of immunity[.]'" *Id*. (quoting *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir.1989)). Thus, even when a "defendant has lost his right not to stand trial, the law is clear the [defendant] can 'reassert [his] qualified immunity claims at and after trial when the factual disputes have been resolved." *Id*. (quoting *Dixon v.*

*Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991)).

Here, Ms. Maestas alleges a constitutional violation. In her § 1983 claim, Ms. Maestas contends that Mr. Lujan, a state employee exercising governmental authority over her, subjected her to sexual harassment. If true, Mr. Lujan's conduct would constitute a constitutional violation. *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) ("Sexual harassment [by a public official or employee] can violate the Fourteenth Amendment right to equal protection of the laws thus triggering a § 1983 cause of action."). Furthermore, Ms. Maestas possesses a clearly established right to be free of such harassment. *Sh.A. ex rel. J.A. v. Tucumcari Mun. Schs.*, 321 F.3d 1285, 1288 (10th Cir. 2003) ("[T]he law holding that sexual harassment is actionable as an equal protection violation has long been clearly established.").

The only remaining issue, then, for qualified immunity purposes, was whether " a reasonable person in [Mr. Lujan's] position would have known that [his] conduct violated [Ms. Maestas's equal protection rights]." *Garramone*, 94 F.3d at 1449. Both parties hotly contested this issue. As stated by Mr. Lujan, and unopposed by Ms. Maestas on appeal, the parties below "presented diametrically opposed versions of their relationship . . . . According to Lujan, he and Maestas had a consensual romantic/sexual relationship for a period of four months. Lujan also either denied Maestas' accusations of harassment and/or sexual harassment,

-10-

or gave radically different versions of these events." Indeed, the parties even contested whether Mr. Lujan was Ms. Maestas's supervisor.

Given this dispute, the district court properly gave a qualified immunity instruction, which limited the jury's inquiry to the objective reasonableness of Mr. Lujan's conduct. *See Roska*, 328 F.3d at 1251. As in *Catone*, here the objective reasonableness of Mr. Lujan's conduct turns on the factual issue of his status as supervisor. *See Catone*, 149 F.3d at 160-61 (holding plaintiff's status as a deputy, which was the key issue for qualified immunity, was a factual question). Moreover, as in *Fisher*, the qualified immunity analysis, at issue here, hinges upon whose version of the facts are believed. *See Fisher*, 234 F.3d at 317 (holding that when "the legal question of qualified immunity turns upon which version of facts one accepts, the jury, not the judge, must determine liability."). Thus, we agree with the *Catone* and *Fisher* courts that such a scenario, as is presented in this case, raises a jury question.

Here, the district court instructed:

> In order for [Mr. Lujan] to prevail on his defense of qualified immunity, he bears the burden of proving by a preponderance of the evidence that he act[ed] at all times in good faith in carrying out discretionary duties, reasonably believing that he was not violating the plaintiff's constitutional rights.

This instruction only permits a jury evaluation of the reasonableness element of the qualified immunity defense, which, given the nature of the factual dispute, is

proper under *Roska* and *Walker*.

We are mindful that "an *immunity from suit* rather than a mere defense to liability . . . is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526 (alternation in original). This case, however, presents the exceptional situation in which the district court cannot complete its qualified immunity analysis without first determining disputed material facts. If Ms. Maestas and Mr. Lujan had engaged in a consensual relationship and Mr. Lujan was not her supervisor, a reasonable person in Mr. Lujan's position would not have known that his conduct violated Ms. Maestas's equal protection rights. *See Trautvetter v. Quick*, 916 F.2d 1140, 1151 (7th Cir. 1990) (absent intent to discriminate on the basis of sex, a "consensual workplace romance involving a state supervisor and employee which soured for one reason or another . . . [does not] give rise to equal protection claims if the employee simply alleges that his or her supervisor's conduct during the term of the romance constituted 'sexual harassment'"). The converse is also true. *See Sh.A. ex rel. J.A.*, 321 F.3d at 1288. In short, the disputed issues of material fact concerning the objective reasonableness of Mr. Lujan's actions are dispositive of the qualified immunity issue. Further, as stated above, Mr. Lujan retained the defense of immunity from liability even though the jury was needed to resolve issues of objective legal reasonableness. *See Guffey*, 18 F.3d at 873. Therefore, the district court properly

presented the reasonableness element of the qualified immunity analysis to the jury.

We are unpersuaded by Ms. Maestas's arguments to the contrary. First, Ms. Maestas suggests that our conclusion invites district courts to frame every qualified immunity issue as a question of fact, contrary to our holding in *Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir. 1992). We disagree. Our holding here is limited. A jury question exists only when a disputed issue of material fact concerning the objective reasonableness of the defendant's actions exists. *Roska*, 328 F.3d at 1251. This ruling does not disturb our previous decisions holding that qualified immunity issues, except in special circumstances, present legal questions resolvable on summary judgment. *See, e.g, Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). Furthermore, because our decision only restates existing law, and we have yet to see a flood of qualified immunity issues sent to juries, we doubt that the district courts will adopt such a practice now.

Finally, Ms. Maestas argues that Mr. Lujan waived his qualified immunity defense. Ms. Maestas contends that Mr. Lujan's failure to raise qualified immunity at any point in the proceedings below, except as an affirmative defense in his Answer and his failure to offer evidence on this issue, other than his own testimony, effectively waives the issue. We disagree.

We find that Mr. Lujan, in the June 7, 2001, Final Pretrial Order, reserved the right to assert all affirmative defenses pleaded in his Answer. Moreover, Ms. Maestas's citation to *Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970), does not support her conclusion. In *Radio Corp.*, we held that a defendant's failure to raise effectively an affirmative defense waives the right to a jury instruction. *Id*. We are not faced with that situation here. Mr. Lujan raised qualified immunity as an affirmative defense in his Answer, referenced the defense in the Pretrial Order, and gave testimony on the matter at trial. We hold, therefore, that Mr. Lujan appropriately raised the qualified immunity issue. *See Guffey*, 18 F.3d at 873 ("A defendant who has appropriately pleaded the affirmative defense of qualified immunity may establish his right to immunity at any point in the proceeding, including at trial.") (quoting *Figueroa-Rodriguez v. Aquino*, 863 F.2d 1037, 1041 n. 5 (1st Cir. 1988)).

B.   The Substance Of The Qualified Immunity Instruction

Reviewing the jury instruction under a plain error standard, we affirm the substance of the qualified immunity instruction. Ms. Maestas did not object to the qualified immunity jury instruction at trial. "We review a jury instruction . . . for plain error when no objection was made [at trial]." *United States v. Fabiano*, 169 F.3d 1299, 1302 (10th Cir. 1999). "Under that standard, we will affirm unless the instructions were 'patently, plainly erroneous and prejudicial.'"

-14-

*Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1245 (10th Cir. 2000). We do not review any particular instruction in isolation; rather, we "must view the [jury] instructions in their entirety . . . ." *Coleman v. B-G Maintenance Management of Colorado, Inc.*, 108 F.3d 1199, 1202 (10th Cir. 1997).

In *Harlow v. Fitzgerald*, 457 U.S. 800, 815-16 (1982), the Court held that the qualified immunity analysis does not consider subjective good faith. *Id.* ("The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial."). Looking to *Harlow*, Ms. Maestas contends that the following instruction constitutes plain error because it injects a subjective element into the qualified immunity analysis:

> In order for [Mr. Lujan] to prevail on his defense of qualified immunity, he bears the burden of proving by a preponderance of the evidence that he act[ed] at all times in good faith in carrying out discretionary duties, reasonably believing that he was not violating the plaintiff's constitutional rights.

We disagree with Ms. Maestas's conclusion. Even assuming that the "acted at all times in good faith" language adds a subjective component, inclusion of this language did not prejudice Ms. Maestas. *See Greene*, 210 F.3d at 1245 (holding that on plain error review, appellant must establish that instruction prejudiced her). The disputed instruction is conjunctive (i.e., to find for Mr. Lujan, the jury must find that (1) Mr. Lujan "act[ed] at all times in good faith," *and* (2) that he

"reasonably believ[ed] that he was not violating plaintiff's constitutional rights"). Thus, even if the district court injected a subjective component, it retained the "reasonably believed" part of the analysis.

The Court in *Harlow* struck the subjective component of the qualified immunity analysis because it placed too harsh of a burden on government officials. *Harlow*, 457 U.S. at 816. The Court reasoned that the subjective component often required "resolution by a jury" of qualified immunity issues and placed "special costs" on officials "performing discretionary functions." *Id.* In an effort to encourage courts to resolve qualified immunity questions on summary judgment, the Court removed the subjective-good-faith factor to aid government officials such as Mr. Lujan. *Id.* at 818 ("Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."). Pursuant to *Harlow*, then, if anyone was prejudiced by the inclusion of a subjective component in the qualified immunity analysis it is Mr. Lujan, not Ms. Maestas.

Ms. Maestas further contends that including the phrase "reasonably believed" in the instruction "is simply not enough to undo the damage done by instructing the jury to look at Mr. Lujan's state of mind." First, as noted above, if the disputed instruction "damaged" anyone, pursuant to *Harlow*, it would be Mr.

Lujan—not Ms. Maestas. Thus, Ms. Maestas's remedial approach to this instruction is flawed from its inception.

Second, the district court's "reasonably believed" language sufficiently apprised the jury of the objective component of qualified immunity analysis to withstand plain error review because it is neither patently nor plainly erroneous. For example, in *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir. 2003), the Ninth Circuit affirmed the following instruction pursuant to the harmless error rule, a more vigorous standard of review than plain error:

> The district court instructed the jury that to be entitled to qualified immunity on [plaintiff's] Fourth Amendment claim, the officers must establish . . . that they held a *reasonable belief* that the search warrant was still valid on June 8, 1998, and there were exigent circumstances giving rise to a concern that additional evidence might still remain in the house and was likely to disappear or be destroyed before police could search the house again . . . . *Id.* (emphasis added).

Given the similarity of the *Dixon* instruction to the instruction challenged here and Ms. Maestas's failure to cite a case where a similarly worded instruction constituted plain error, we reject Ms. Maestas's argument on this score.

In sum, the disputed instruction was only prejudicial, if at all, to Mr. Lujan. Moreover, the "reasonably believed" language, while not ideal, adequately conveys, under plain error review, the objectively reasonable component of the qualified immunity defense as it is not patently nor plainly erroneous.

C.    The Substance Of The § 1983 Instruction

Ms. Maestas did not object to the § 1983 jury instruction at trial; therefore, we review the instruction under the plain error standard, as described above, and affirm.

At trial, Ms. Maestas brought two sexual harassment theories of recovery: a Title VII claim against the Department and a § 1983 claim against Mr. Lujan individually.  In her Title VII claim, Ms. Maestas may recover only if her harasser was her supervisor.  *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1227-28 (10th Cir. 2000);  *see also Rubidoux v. Colorado Mental Health Inst.*, 173 F.3d 1291, 1295 (10th Cir. 1999).  In contrast, Ms. Maestas may recover in her § 1983 claim if Mr. Lujan either (1) was her supervisor or (2) exercised state authority over her.  *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994). [1]

The parties to this appeal do not contest the above analysis.  Rather, Ms. Maestas contends that the following instruction constitutes plain error because it applies the Title VII suit-against-the-state standard to her § 1983 suit against Mr. Lujan in his individual capacity.  The challenged instruction states:

---

[1] The elements of a § 1983 claim are: (1) The plaintiff was deprived of a right secured by the Constitution or laws of the United States, and (2) defendant deprived them of this right acting under color of state law. *Johnson v. Rodrigues*, 293 F.3d 1196, 1202  (10th Cir. 2002).  Here, the 'under color of law' element is met if Mr. Lujan either (a) was Ms. Maestas's supervisor or (b) exercised state authority over her. *Noland*, 39 F.3d at 271.

-18-

To establish a state action to support a claim of sexual harassment under this Civil Rights Act, the defendant charged with sexual harassment must be the plaintiff's supervisor or exercise state authority over the plaintiff.

Now, that's in contrast to the claim that's made against the State.

In evaluating the claim made against the State, you need to decide as a matter of fact whether he was her supervisor. When you're considering this claim, the defendant must have been her supervisor in order for her to recover anything.

Ms. Maestas asserts that the "plain language of the instruction indicates that the District Court erroneously instructed the jury that it must find that Mr. Lujan was Ms. Maestas' supervisor in order for Ms. Maestas to recover under section 1983." Essentially, Ms. Maestas argues that the district court's language stating "When you're considering this claim, the defendant must have been her supervisor" references the claim against Mr. Lujan individually, and not the claim against the state. We disagree.

We read the challenged instruction in the context of the jury instructions as a whole. *See Coleman*, 108 F.3d at 1202 (noting that the court of appeals "must view . . . [jury] instructions in their entirety"). In that context, it is clear that the district court properly applied the § 1983 standard to Ms. Maestas's claim. The challenged instruction simply compares Ms. Maestas's Title VII claim to her § 1983 claim. That is to say, the instruction represents an effort by the district court to distinguish the factually similar, but legally distinct, Title VII claim from

the § 1983 claim.  Even if this method caused some confusion, Ms. Maestas offers no citation to support her conclusion that this potential ambiguity rises to the level of plain error.  Indeed, in context, we find no error at all from the disputed instruction.  We hold, therefore, that the district court properly instructed the jury regarding the § 1983 claim.

D.      The Colorado Governmental Immunity Act And The Continuing Violation Doctrine

We reverse the district court's application of the continuing violation doctrine to toll Ms. Maestas's failure to comply with the notice provisions of the Colorado Governmental Immunity Act ("CGIA").      *See* Colo. Rev. Stat. § 24-10-101 *et. seq* .  Mr. Lujan originally raised this issue in the context of a Rule 12(b)(1) motion to dismiss for lack of jurisdiction.  "Rule 12(b)(1) motions generally take one of two forms."      *Stuart v. Colorado Interstate Gas Co.*    , 271 F.3d 1221, 1225 (10th Cir. 2001).  The moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests.      *Id.*  We review de novo the district court's dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and review findings of jurisdictional facts, if any, for clear error.  *Id.*

At trial, Mr. Lujan's Rule 12(b)(1) motion argued that the district court lacked jurisdiction based on Ms. Maestas's failure to give notice of her tort claim within 180 days of discovering her injury. The district court denied that motion. The statutory notice provisions of the CGIA apply when federal courts hear Colorado tort claims under supplemental jurisdiction.[2] *Renalde v. City & County of Denver, Colo.*, 807 F. Supp. 668, 675 (D. Colo. 1992) (holding that Colorado tort claims brought by a private plaintiff under pendent jurisdiction are subject to the notice provisions of the CGIA as a jurisdictional prerequisite to suit).

Section 24-10-109(1) of the CGIA states:

> Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment, whether or not by a willful and wanton act or omission, shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury. Compliance with the provisions of this section shall be a jurisdictional prerequisite to any action brought under the provisions of this article, and failure of compliance shall forever bar any such action. Colo. Rev. Stat. § 24-10-109(1).

The CGIA requires that anyone with a claim against a public entity "must file a written notice of the claim within one hundred eighty days after the date of

---

[2]In *King v. United States*, 301 F.3d 1270, 1277 (10th Cir. 2002), we held that the CGIA notice provisions do not apply to federal common law claims brought by the United States. *King* is inapposite here for two reasons. First, the United States is not the plaintiff, or even a party. Second, the Plaintiffs bring state law tort claims, not federal common law claims.

the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury." *Gallagher v. Bd. of Trs. for Univ. of N. Colo.*, 54 P.3d 386, 390-91 (Colo. 2002) (internal citations and quotations omitted). "Complying with the notice of claim is a jurisdictional prerequisite to suit." *Id*. at 391. "Furthermore, section 24-10-109(1) is a non-claim statute, meaning that failure to comply with the 180-day period is an absolute bar to suit." *Gallagher*, 54 P.3d at 393. "[N]on-claim statutes and the issue of subject matter jurisdiction are not subject to equitable defenses such as waiver, tolling, or estoppel." *Id.*

Ms. Maestas filed formal notice of her outrageous conduct tort claim on April 1, 1999. [3] At first blush, then, the CGIA bars any injuries that occurred to Ms. Maestas prior to October 1, 1998. With a few exceptions, the bulk of the incidents that form the foundation for Ms. Maestas's outrageous conduct claim occurred before October 1, 1998.

The district court, relying upon *Patel v. Thomas*, 793 P.2d 632 (Colo. Ct. App. 1990), held that the continuing violation doctrine remedied Ms. Maestas's alleged failure to comply with the CGIA's notice requirement. The continuing violation doctrine allows, "under proper circumstances [in Title VII cases], a plaintiff [to] recover for discriminatory acts that occurred prior to the statutory

---

[3]Ms. Maestas claims that she filed as early as April 28, 1998.

limitations period if they are part of a continuing policy or practice that includes the act or acts within the statutory period." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003) (internal citations and quotations omitted).

The Colorado Court of Appeals, in *Patel*, applied the continuing violation doctrine to toll the CGIA notice requirements in a sexual harassment case. *Patel*, 793 P.2d at 638. At the time of the district court's ruling, the Colorado Supreme Court had yet to address the application of the continuing violation doctrine to the CGIA. Thus, the district court, at the time it made its ruling, appropriately applied *Patel*. *Craven v. University of Colo. Hosp. Auth.*, 260 F.3d 1218, 1231 (10th Cir. 2001) ("While not binding on this court, decisions by a state's intermediate appellate courts provide evidence of how the state's highest court would rule on the issue, and we can consider them as such.") (internal quotations omitted).

After the district court's ruling, however, the Colorado Supreme Court held that plaintiffs cannot use the continuing violation doctrine to remedy untimely filings. *Gallagher*, 54 P.3d at 393. The *Gallagher* court reasoned as follows:

> Comparison of the nature of the Title VII filing deadline to that of the CGIA 180-day notice of claim provision convinces us that the judicially-constructed continuing violation doctrine cannot be used to remedy an untimely filing under the CGIA. . . . [Plaintiff] additionally points to the court of appeals' case of *Patel v. Thomas*, 793 P.2d 632 (Colo. App. 1990) to support his argument that the continuing violation doctrine should be invoked by this court. In *Patel*, the court of appeals applied the continuing violation doctrine to hold that a plaintiff's sexual harassment

claims were not barred for failure to comply with the CGIA 180-day notice of claim deadline. We do not find the reasoning of *Patel* convincing and to the extent it is inconsistent with today's holding, we overrule it.
*Gallagher*, 54 P.3d at 393.

Because the Colorado Supreme Court has now spoken to the issue, we apply *Gallagher* on appeal. *Davidson*, 337 F.3d at 1184 ("Where a change in law occurs while a case is on appeal, we apply the law in effect at the time of our decision."). Given that the Colorado Supreme Court now prohibits the use of the continuing violation doctrine in the CGIA context, and has explicitly overruled *Patel*—a sexual harassment case—we reject Ms. Maestas's suggestion that *Gallagher* applies only to whistle-blower cases.

Next, we must determine when the CGIA 180-day clock began to run. "[F]or purposes of the CGIA, the plaintiff need not yet know the cause of the injury nor must all elements of the claim have ripened before she must file her notice of claim. . . . [T]he 180-day time limit may expire if she waits to discover the cause of her injury before filing pursuant to the CGIA." *Gallagher*, 54 P.3d at 391 (citations omitted). "[T]he CGIA notice period is triggered upon discovery of the injury[,] and . . . when there are disputed issues of fact regarding when an injury is discovered, the trial court is the pre-trial fact-finder and must hold an evidentiary hearing to resolve those issues." *Id.* at 392.

The parties on appeal dispute (1) when Ms. Maestas filed proper CGIA notice, (2) when Ms. Maestas first knew of her tort injuries so as to trigger the

-24-

CGIA 180-day notice requirement, and (3) if Ms. Maestas presented sufficient evidence to support an outrageous conduct tort claim. Mr. Lujan argues that Ms. Maestas filed her CGIA notice on April 1, 1999, and that Ms. Maestas knew of the alleged tortious behavior prior to October 1, 1998. Moreover, Mr. Lujan argues that we may, as a matter of law, determine that the behavior to which Ms. Maestas was subjected does not constitute the tort of outrageous conduct. *See Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994) ("Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question."). Ms. Maestas, on the other hand, argues that she gave proper CGIA notice as early as April 28, 1998, and that she first knew of the alleged tortious behavior after October 1, 1998. Indeed, Ms. Maestas argues that the very nature of the tort of outrageous conduct, which often requires a series of outrageous events, precluded discovery of the injury resulting from outrageous conduct until after October 1, 1998. *See Behunin v. Dow Chem. Co.*, 650 F. Supp. 1387, 1392 (D. Colo. 1986) (holding that outrageous conduct normally requires a pattern of conduct). [4]

---

[4]The nature of the outrageous-conduct claim does not return the continuing violation doctrine to this case through the backdoor. Rather, it raises the issue of when, if at all, did a combination of events culminate to reach the level of outrageous conduct so as to start the CGIA 180-day clock. Although the conduct

(continued...)

As to Ms. Maestas's position, the district court, not a court of appeals, must answer the factual questions of when Ms. Maestas filed CGIA notice and when she first knew, or should have known, of her tortious injuries. *Gallagher*, 54 P.3d at 392 (factual issues regarding the filing of CGIA notice are for the trial court).

Turning to Mr. Lujan's final argument, "[a]s a general rule, we do not consider an issue not presented, considered, and decided by the district court." *United States v. Duncan*, 242 F.3d 940, 950 (10th Cir. 2001). Upon our review of the record, we find that Mr. Lujan raised the insufficiency of the evidence issue in a cursory manner, on an oral motion for judgment as a matter of law, without any reference to authority. Given this cursory presentation, it is questionable whether Mr. Lujan sufficiently presented this issue to the trial court. Regardless, we cannot conduct the relevant legal analysis without the factual determination of what conduct is, and is not, barred from consideration for failure to comply with the CGIA notice provision. In other words, we cannot determine whether sufficient evidence exists without full knowledge of what evidence is before us.

Given this factual quagmire, we remand to the district court with

_____

[4](...continued)
of the defendant may continue past this culmination point, this continuing conduct will not toll the CGIA 180-day notice period. This analysis contrasts with the continuing violation doctrine, where acts that occurred prior to the statutory limitations period, if they are part of a continuing policy or practice that includes the act or acts within the statutory period, are not barred .

instructions to determine (1) when Ms. Maestas first discovered, or should have discovered, her tortious injury and (2) when she filed CGIA notice. *See Gallagher*, 54 P.3d at 392 ("Given the factual dispute in this case regarding when [plaintiff] discovered or should have discovered through reasonable diligence that he was wrongfully injured, we reverse the holding of the court of appeals with directions to remand to the trial court for an evidentiary hearing to determine when [plaintiff] discovered or should have discovered his injury and if [plaintiff], in fact, complied with the CGIA 180-day notice of claim provision."). Having made these findings, the district court shall modify the judgment against Mr. Lujan consistent with this opinion.

## III.  Conclusion

For the foregoing reasons, we **AFFIRM** sending the qualified immunity issue to the jury. We **AFFIRM** the substance of the qualified immunity and § 1983 instructions. We **REVERSE** the application of the continuing violation doctrine to the outrageous conduct claim. And we **REMAND** with instructions to conduct a factual inquiry as to when Ms. Maestas first knew, or should have known, of her tort injury and when she filed CGIA notice.

Nos. 01-1464 and 01-1489, Maestas v. Lujan

**BRISCOE,** Circuit Judge, concurring:

I concur in the outcomes set forth in the majority opinion. I write separately only on the qualified immunity issue, which I would analyze differently. The majority concludes there was a factual dispute regarding the reasonableness element of the qualified immunity defense which under Roska ex rel. Roska v. Peterson, 328 F.3d 1230 (10th Cir. 2003), and Walker v. Ebert, 75 F.3d 592 (10th Cir. 1996), would permit the qualified immunity issue to go to the jury. I would conclude that the district court erred in submitting the qualified immunity issue to the jury but that the error did not rise to the level of plain error[1] because the jury was properly instructed regarding plaintiff's clearly established right to be free from sexual harassment. See J.A. v. Tucumcari Mun. Schs., 321 F.3d 1285, 1288 (10th Cir. 2003) (stating "the law holding that sexual harassment is actionable as an equal protection violation has long been clearly established"); Lutz v. Weld County Sch. Dist., 784 F.2d 340, 343-44 (10th Cir. 1986) (holding

---

[1] Maestas concedes she did not object to the qualified immunity instruction and that a plain error scope of review applies. "Courts repeatedly have cautioned that the plain error exception is limited to exceptional cases where the error 'has seriously affected the fairness, integrity or public reputation of judicial proceedings.'" Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1516 (10th Cir. 1984) (quoting Rowe International, Inv. v. J-B Enterprises, Inc., 647 F.2d 830, 835 (8th Cir. 1981)); see also 9A C.Wright & A. Miller, Federal Practice and Procedure § 2558, at 462 (1995) ("Actual reversals on the basis of plain error are rather infrequent, though they have become more numerous in recent years.").

improper submission of qualified immunity issue to jury was not reversible error when jury was properly instructed regarding plaintiff's clearly established rights). Although I would also conclude the wording of the instruction incorrectly conveyed that qualified immunity involves both subjective and objective elements, I agree with the majority that Maestas was not prejudiced by the substance of the instruction because it stated the two purported elements conjunctively.

For two reasons, I conclude the district court should not have instructed the jury on qualified immunity. First, Lujan did not properly raise the issue. Although Lujan raised qualified immunity as an affirmative defense in his answer to the second amended complaint, he did not raise the issue in a motion to dismiss or a motion for summary judgment. Further, the issue of qualified immunity was not raised specifically in the pretrial order.

The majority cites Guffey v. Wyatt, 18 F.3d 869, 873 (10th Cir. 1994), in support of its conclusion that the affirmative defense of qualified immunity once pled as an affirmative defense may then be raised at any point in the proceedings. Guffey filed a 42 U.S.C. § 1983 action against Wyatt, a police officer, alleging Wyatt's actions against Guffey constituted an arrest without probable cause in

violation of the Fourth Amendment.[2]  In Guffey, the qualified immunity defense was not only pled but also raised in a motion for summary judgment and, apparently, specifically included in the pretrial order.  Id. at 18 F.3d at 870-71, 873 n. 6.  It is well established that the pretrial order is the controlling document for trial.  Wilson v. Muckala, 303 F.3d 1207, 1215-16 (10th Cir. 2002).  Further, in Guffey, we expressly declined to rule on the question of whether the jury should be instructed on the issue of qualified immunity.  18 F.3d at 873.

Second, Lujan presented no evidence at trial to support the defense.  His position throughout is best described as a general denial of all allegations against him.  Such a denial does not raise a question of fact relevant to the qualified immunity inquiry which would justify a jury instruction on qualified immunity.

It is helpful to first consider how the qualified immunity inquiry typically works.  The first step of the qualified immunity analysis is to ask: "Taken in the light most favorable to the party asserting the injury, *do the facts alleged* show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001) (emphasis added).  "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  "The relevant, dispositive inquiry

---

[2]  Guffey, like Fisher v. Memphis, 234 F.3d 312 (6th Cir. 2000), and unlike our present case, involved the issue of Fourth Amendment reasonableness which often turns on resolution of contested facts.

in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. In the vast majority of cases, there is no question of fact relevant to the qualified immunity issue. In some cases, as the majority notes, evidence of "exceptional" or "extraordinary" circumstances may create an issue of fact and justify submission of the qualified immunity question to the jury. This is not such a case.

The "extraordinary circumstances" exception to the lack of immunity was first identified in Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). In Harlow, the Supreme Court explained its scope as follows: "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the *relevant legal standard*, the defense should be sustained. But again, the defense would turn primarily on objective factors." Id. at 818-19 (emphasis added).

In Lutz, we discussed when it is appropriate to instruct a jury on qualified immunity. First, the defendant must have properly raised the defense. The plaintiff then has the burden of convincing the court that the law relied upon was clearly established at the time of the alleged constitutional violation. If the

-4-

plaintiff fails to carry this burden, judgment must be entered in favor of the defendant who has raised the defense. On the other hand, if the plaintiff does carry the burden, the defendant is entitled to a jury instruction on qualified immunity "only by raising a fact issue as to whether there were exceptional circumstances such that a reasonable person in [his] position[] would not have known of the *relevant legal standard*." Lutz, 784 F.2d at 343 (emphasis added).

Harlow and Lutz indicate that the factual inquiry relevant to the qualified immunity question, if any, is whether there were "extraordinary" or "exceptional" circumstances so that the defendant neither knew nor should have known of the "relevant legal standard." In this case, the defendant did not assert that "extraordinary circumstances" prevented him from knowing the relevant legal standard that governed his conduct. His contention that he was not Maestas' supervisor at all times relevant to her complaint does not go to the question of whether he knew or should have known the relevant legal standard. Rather, whether Lujan was Maestas' supervisor is relevant to the question of whether he acted under color of state law and, thus, whether he is accountable under Section 1983.

The cases from this circuit upon which the majority relies, Roska and Walker, are distinguishable. Unlike the defendants in Roska and Walker, Lujan was not relying on "exceptional circumstances" as a reason for his alleged

actions.  We do not have the situation here where the defendant has asserted extraordinary circumstances justifying his ignorance of the relevant legal standard, such as reliance on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question.  See Roska, 328 F.3d at 1251-52 (defendants claimed facially valid state statute sanctioned their conduct); Walker, 75 F.3d at 598-99 (defendant claimed to be a mid-level manager merely following university policy).  Nor does Lujan allege that he relied on the advice of counsel which effectively "prevented [him] . . . from knowing the relevant legal standard," even though the relevant constitutional principle was clearly established.  Roska, 328 F.3d at 1254 (quoting V-1 Oil Co. v. State of Wyoming, 902 F.2d 1482, 1488-89 (10th Cir. 1990)).  Rather, the dispute at trial centered on whether Lujan actually violated Maestas' Fourteenth Amendment rights.  Whether extraordinary circumstances prevented him from knowing the relevant legal standard was not an issue.

Further, I find neither Fisher v. City of Memphis, 234 F.3d 312 (6th Cir. 2000), nor Catone v. Spielmann, 149 F.3d 156 (2d Cir. 1998), persuasive.  Crucial to the court's analysis in Fisher was that the case involved a Fourth Amendment excessive force claim.  While acknowledging that the issue of qualified immunity "normally rests with the court," the court stated, "in cases arising under the Fourth Amendment's reasonableness standard the applicability of qualified

-6-

immunity will often turn on the resolution of contested factual issues." Fisher, 234 F.3d at 317. In Fisher, the question submitted to the jury was whether the defendant officer's "use of deadly force had been objectively unreasonable." Id. It is not at all clear that Fisher still represents a proper understanding of the intersection of excessive force and qualified immunity analyses. The year after Fisher was decided, the Supreme Court in Saucier clarified that the inquiries for excessive force and qualified immunity are distinct. Saucier, 533 U.S. at 204. Even when an arresting officer's alleged use of force was not objectively reasonable, the officer may be shielded from suit by the doctrine of qualified immunity because the qualified immunity inquiry focuses on the question of whether the officer reasonably could have been mistaken about the applicable legal constraints. See id. at 204-06.[3] Assuming that the qualified immunity issue in Fisher was correctly decided, the case is not helpful outside the context of Fourth Amendment cases.

In Catone, the court did not directly address the question of whether it was

---

[3] Under Graham v. Connor, 490 U.S. 386, 388, 394 (1989), the Fourth Amendment excessive force inquiry requires courts to consider whether an arresting officer's use of force was objectively reasonable. In Saucier, the petitioner argued that the qualified immunity inquiry was redundant in cases analyzed under Graham. Saucier, 533 U.S. at 204. The Court rejected that position, stating that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the *legal constraints* on particular police conduct." Id. at 205 (emphasis added).

appropriate to give a jury instruction on the qualified immunity defense. The issue before the court was whether the court had jurisdiction under 28 U.S.C. § 1291 to hear an appeal from the district court's rejection of the qualified immunity defense at the summary judgment stage. Catone, 149 F.3d at 158-59. Such orders are appealable when they turn on "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." Johnson v. Jones, 515 U.S. 304, 313 (1995) (internal quotation omitted); see also Behrens v. Pelletier, 516 U.S. 299 (1996). In Catone, the court held that the district court's order was not immediately appealable because there remained questions of fact with regard to plaintiff's status, i.e., was she in fact a deputy or were there sufficient facts to establish that an individual in Defendant Spielmann's shoes reasonably would have believed plaintiff was a deputy. While described generally as qualified immunity questions, the first question concerned whether plaintiff had a protected property interest which would prohibit her discharge without a pre-termination hearing. If she was a deputy, she had no protected property right. However, if she was not a deputy, but Defendant Spielmann had reason to believe she was, Spielmann was immune from liability because he relied on the cited civil service law which permits termination of an individual holding the position of deputy without a pre-termination hearing. Catone, 149 F.3d at 160. As regards the qualified immunity analysis, Catone fits

within the "extraordinary circumstances" rule defined by <u>Harlow</u>, <u>Lutz</u>, <u>Roska</u>, and <u>Walker</u>.