# State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments

Where federal law enforcement officers have been deployed pursuant to the Stafford Act and are properly carrying out federal disaster relief in a local community, they may accept deputation under state or local laws that expressly authorize them to make arrests, where such arrests would bear a logical relationship to or advance the purposes of the Stafford Act deployment.

March 5, 2012

MEMORANDUM OPINION FOR THE ACTING CHIEF COUNSEL
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

You have asked whether federal law enforcement officers ("FLEOs") may accept deputation, conferred by state or local law, to make arrests for violations of state or local criminal laws, when they have been deployed to provide either disaster or emergency relief, or assistance in the aftermath of an act of terrorism.[1] Such deployments generally occur after a presidential declaration of a major disaster or emergency under the Robert

---

[1] *See* Memorandum for Kelly Dunbar, Attorney-Adviser, Office of Legal Counsel, from Stephen R. Rubenstein, Chief Counsel, Bureau of Alcohol, Tobacco, Firearms, and Explosives (Dec. 22, 2010) ("ATF Modified Request"). This request for advice superseded an earlier ATF request. *See* Memorandum for David Barron, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Stephen R. Rubenstein, Chief Counsel, Bureau of Alcohol, Tobacco, Firearms, and Explosives (July 16, 2010). In preparing our advice in response to the modified request, we solicited and received views from the Department of Homeland Security, *see* Memorandum for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from the Office of the General Counsel, Department of Homeland Security (May 2, 2011) ("DHS Memo"); the Drug Enforcement Administration, *see* Memorandum for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from Wendy H. Goggin, Chief Counsel, Drug Enforcement Administration (Mar. 4, 2011) ("DEA Memo"); the Federal Bureau of Investigation, *see* Memorandum for the Deputy Assistant Attorney General, Office of Legal Counsel, from Valerie Caproni, General Counsel, Federal Bureau of Investigation (Mar. 15, 2011) ("FBI Memo"); the Department of Agriculture, *see* E-mail for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from Thomas Millet, Associate General Counsel, Natural Resources, Department of Agriculture (Mar. 8, 2011) ("Forest Service Memo"); and the United States Marshals Service, *see* E-mail for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from Gerald Auerbach, General Counsel, United States Marshals Service (Feb. 24, 2011) ("USMS Memo").

T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121–5208 (2006 & Supp. IV 2010) ("Stafford Act"). As an operational matter, we understand that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") coordinates the deployment of certain FLEOs under the auspices of Emergency Support Function 13 ("ESF-13"), the public safety and security component of the National Response Framework ("NRF"), which is the set of comprehensive plans and protocols that structure the federal government's response to disasters and emergencies.

We conclude that FLEOs may accept the deputation conferred by state law[2] and make arrests for violations of state law, as authorized by state deputation statutes,[3] when two conditions are met: Authority to make arrests under state law must be granted *expressly* by either federal or state law; and the FLEOs' exercise of authority must comply with the Purpose Act, 31 U.S.C. § 1301(a) (2006), which requires that federal funds be used only for the purposes for which they were appropriated. With respect to the first condition, we find that ATF's organic statute does not expressly grant FLEOs authority to make arrests for *state* law violations, and that the Stafford Act does not expressly grant federal officials *any* arrest authority, much less authority to make arrests for violations of state law. But state deputation laws that expressly authorize federal officials to make arrests for state law violations may fulfill the federal law requirement that FLEOs' arrest authority be expressly granted. With respect to the second condition, although state law may authorize FLEOs to make arrests for state law violations, state law cannot authorize the expenditure of federal resources. We conclude, however, that arrests made by FLEOs pursuant to express state law authorization and in the context of a Stafford Act deployment satisfy the Purpose Act when the arrests bear a "logical relationship to the objectives" of the Stafford Act. *See Use of General*

---

[2] You requested advice concerning state and local deputation laws. For ease of exposition, we will refer to state deputation laws throughout, but our analysis is equally applicable to valid local laws.

[3] Our conclusions in this memorandum pertain solely to FLEOs' authority to make arrests pursuant to state deputation laws during a Stafford Act deployment. Although our analysis may have implications for FLEOs' authority to perform other state law enforcement functions, such as the execution of search warrants, the seizure of evidence, or other investigatory activities, we do not address those authorities in this opinion.

*Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 153 (1997) ("*Employee Business Cards*"); *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986) ("*Indemnification of DOJ Employees*").

## I.

The Stafford Act is the principal federal statute relied upon to deploy federal officials to assist state and local communities with disaster or emergency relief (collectively, "emergency relief"). Pursuant to the Act, the President may direct federal personnel, including FLEOs, to undertake various activities in support of state and local authorities in the event of any "major disaster." *See* 42 U.S.C. §§ 5170a, 5170b, 5192. The Act defines "major disaster" as "any natural catastrophe . . . or, regardless of cause, any fire, flood, or explosion, in any part of the United States, which in the determination of the President causes damage of sufficient severity and magnitude to warrant major disaster assistance under this [Act]." *Id.* § 5122(2). The Act authorizes executive departments and agencies, under the direction of the Federal Emergency Management Agency within the Department of Homeland Security ("DHS"), to provide various forms of assistance to state and local communities. *See id.* § 5170a(1) (authorizing the President in "any major disaster" to "direct any Federal agency, with or without reimbursement, to utilize its authorities and the resources granted to it under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) in support of State and local assistance response or recovery efforts"); *id.* § 5170b(a) (authorizing federal agencies to "provide assistance essential to meeting immediate threats to life and property resulting from a major disaster," including "[p]erforming . . . any work or services essential to saving lives and protecting and preserving property or public health and safety"); *id.* § 5192 (authorizing similar federal assistance in "any emergency").

The federal government coordinates its emergency response efforts using the National Response Framework, a comprehensive set of planning documents and annexes that has been in place since January 2008. *See* DHS, *National Response Framework* (Jan. 2008), http://www.fema. gov/emergency/nrf/. ATF agents, in particular, are deployed pursuant to

ESF-13, the annex that sets out the federal resources that may be used to secure public safety and security in the event of an emergency.[4] *Emergency Support Function #13—Public Safety and Security Annex* at 13–14 (Jan. 2008) ("ESF-13"), http://www.fema.gov/pdf/emergency/nrf/nrf-esf-13.pdf. This annex designates the Department of Justice as the lead agency during response efforts, and the Department has, in turn, designated ATF to implement ESF-13 by coordinating federal security planning and general law enforcement efforts. According to the annex, state, tribal, local, and private-sector authorities "have primary responsibility for public safety and security." ESF-13, however, enables FLEOs to provide "public safety and security assistance to support preparedness, response, and recovery priorities in circumstances where State, tribal, and local resources are overwhelmed or inadequate, or where Federal-to-Federal support is needed or a unique Federal capability is required." ESF-13 at 4.

You have asked us whether FLEOs have the authority pursuant to state deputation laws to make arrests for violations of state criminal law during an ESF-13 deployment. As you have explained, to fulfill their public safety and security mission during such a deployment, FLEOs currently "polic[e] [certain] misdemeanor offenses," as authorized by state peace officer statutes. ATF Modified Request at 1. We concluded in a prior opinion that such statutes may confer arrest authority on federal officials in certain circumstances. *See infra* p. 85. But, as you have also explained, those peace officer statutes generally confer on FLEOs only authority to enforce state felony or violent misdemeanor laws. The state peace officer statutes may therefore leave FLEOs unable to fully address security threats in the wake of disasters, because the statutes do not provide FLEOs with authority to make arrests for non-violent misdemeanors, which could include violations associated with the "looting of businesses, pharmacies, banks, and homes." ATF Modified Request at 2. You have advised us that certain state deputation statutes, in contrast, would authorize FLEOs to exercise the same law enforcement authority that state

---

[4] Your request concerns circumstances in which an ESF-13 activation has occurred upon the request of the appropriate state official and after the President has made a Stafford Act declaration. *See* ATF Modified Request at 1; 42 U.S.C. § 5170.

officials possess, thus providing FLEOs with the authority to fully enforce state laws when deployed under ESF-13. *Id.*

Before turning to the question you have raised, we note that there is an additional federal statute that authorizes federal emergency assistance to states. The Emergency Federal Law Enforcement Assistance Act ("EFLEA"), 42 U.S.C. §§ 10501–10513 (2006), authorizes the Attorney General to provide federal law enforcement assistance to states during crime emergencies, in a manner analogous to the federal provision of assistance through the Stafford Act. Under EFLEA, upon receipt of a written application for assistance from a state governor, the Attorney General may provide "Federal law enforcement assistance" to a state overwhelmed by a "law enforcement emergency," where "State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law." *Id.* §§ 10501, 10502(3). Such assistance may include "funds, equipment, training, intelligence information, [or] personnel." *Id.* §§ 10501(a)–(b), 10502(1). Congress made clear, however, that EFLEA is not the exclusive source of authority for federal emergency assistance to states and would not displace federal emergency assistance under the Stafford Act, by providing that "[n]othing" in the statute should "be construed to limit any authority to provide emergency assistance otherwise provided by law." *Id.* § 10503(e). Because EFLEA does not displace the Stafford Act, and because your request for advice concerns FLEOs' authority during an ESF-13 activation following a Stafford Act declaration, we do not consider whether EFLEA might provide FLEOs with express authority to make arrests for violations of state law. *See also infra* note 12.

## II.

To determine whether FLEOs may make arrests for violations of state law during Stafford Act deployments, we begin with the well-established premise that federal authority to exercise law enforcement powers, including the authority to make arrests, "must be conferred expressly by statute." *Authority of the State Department Office of Security to Investigate Passport and Visa Fraud*, 8 Op. O.L.C. 175, 181 (1984) ("*Visa Fraud*"); *see* Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Request by the*

*Department of Justice for Assistance from the Department of Treasury in the Enforcement of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq., and the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951 et seq.* at 7 (Dec. 23, 1983) ("special law enforcement powers such as the right to make arrests without warrant and execute search warrants must be conferred expressly by statute"). This requirement derives in part from the fact that the power to arrest is an "awesome power." *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1346 (7th Cir. 1985). The requirement accordingly ensures that this power is exercised only pursuant to specific legislative authorization. *See also Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000); *Guffey v. Wyatt*, 18 F.3d 869, 872 (10th Cir. 1994).

Numerous federal statutes expressly authorize various federal officers to make arrests for specified types of violations, but we are aware of no authority for the proposition that "a federal officer may exercise these powers without express statutory authority." Memorandum for Robert Davis, Special Assistant to the Deputy Attorney General, from Jim Hirschhorn, Attorney-Adviser, Office of Legal Counsel, *Re: Present Statutory Authority for DEA Deputization Arrangements* (May 31, 1979); *see also* Memorandum for William H. Webster, Director, Federal Bureau of Investigation, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Use of FBI Support Personnel to Monitor Title III Surveillance* at 19 (Oct. 31, 1984) ("law enforcement powers such as the right to carry firearms, make arrests without warrant, execute search warrants, and seize evidence, are expressly conferred by statute on 'agents' of the responsible agency").

Moreover, though many federal statutes expressly confer arrest authority on FLEOs, as a general rule these statutes expressly authorize FLEOs to enforce only *federal* law.[5] For example, in reviewing the authorities

---

[5] *See* 28 U.S.C. § 533 (2006 & Supp. III 2009) (authorizing Attorney General to appoint officials to "detect and prosecute crimes against the United States"; "assist in the protection of the person of the President" and the "Attorney General"; and conduct "other investigations regarding official matters under the control of" the Departments of Justice and State); 28 C.F.R. § 0.85(a) (2008) (authorizing the Federal Bureau of Investigation to investigate violations of federal law unless jurisdiction is specifically assigned to another agency); 18 U.S.C. § 3052 (2006) (authorizing certain officials, and "inspectors and agents" of the Federal Bureau of Investigation, to "carry firearms, serve

that define the jurisdiction of the Federal Bureau of Investigation ("FBI"), we have emphasized that they provide FBI agents with authority to enforce federal law, *not* to take action with respect to violations of state law. *See Responsibility and Authority of FBI Agents to Respond to Criminal Offenses Outside the Statutory Jurisdiction of the FBI*, 2 Op. O.L.C. 47, 47–48 (1978) ("*FBI Jurisdiction*"). As we also have observed, "[s]everal courts have noted that, in the absence of a congressional mandate, Federal agents have no power under Federal law to arrest for State offenses." *Id.* at 48; *cf. Authority of the Federal Bureau of Investigation to Investigate Police Killings*, 5 Op. O.L.C. 45, 48–49 (1981) ("*Police Killings*") (reaffirming conclusions of *FBI Jurisdiction* opinion). We accordingly have advised that, if no explicit federal authority to arrest for state offenses exists, "FBI agents cannot act under Federal authority and must rely instead on State law." *FBI Jurisdiction*, 2 Op. O.L.C. at 48; *see also Authority of FBI Agents, Serving as Special Deputy United States Marshals, to Pursue Non-Federal Fugitives*, 19 Op. O.L.C. 33, 45 (1995) (advising that U.S. Marshals "generally lack any inherent or common law authority to pursue or arrest fugitives wanted solely for state law violations," where there is no "reason to believe that the pursuit or arrest will prevent the commission of a federal felony").

In light of this long-settled precedent, we must find an express statutory grant of authority to FLEOs to make arrests for state law violations in order to conclude that FLEOs mobilized during an ESF-13 activation have that power. We conclude that, while neither ATF's organic statute nor the

---

warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony"); 28 U.S.C. § 566(d) (2006) ("[e]ach United States marshal, deputy marshal, and any other official of the Service as may be designated by the Director may carry firearms and make arrests without warrant for [certain federal offenses]"); 21 U.S.C. § 878 (2006) (authorizing any "officer or employee of the Drug Enforcement Agency" to "carry firearms"; "execute and serve search warrants, arrest warrants, administrative inspection warrants, subpoenas, and summonses issued under the authority of the United States"; and "make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony").

Stafford Act expressly provides such authority, certain state deputation laws may.

## A.

As set forth above, the organic statutes of federal law enforcement agencies typically provide FLEOs with express authority to enforce federal but not state law. *See supra* note 5 and accompanying text (collecting statutory authorities). Under its organic statute, ATF is charged primarily with investigating "criminal and regulatory violations of the *Federal* firearms, explosives, arson, alcohol, and tobacco smuggling laws." 28 U.S.C. § 599A(b)(1) (2006) (emphasis added). By its terms, that statute does not confer on ATF agents the authority to make arrests for state law violations or otherwise to enforce state law.

We also conclude that the Stafford Act does not expressly authorize FLEOs to make state law arrests. The Stafford Act contains no reference at all to law enforcement or arrest authority. And the NRF and ESF-13 frameworks implementing FLEO deployments in disasters and emergencies are not themselves legal authorities that could provide the requisite express authorization. This determination is in accord with the conclusions of several of the agencies whose views we solicited.[6]

To be sure, certain provisions of the Stafford Act, if construed broadly, could be read to contemplate FLEO enforcement of some state laws. Section 5170b(a)(3) authorizes federal agencies to perform "any work or services essential to saving lives and protecting and preserving property or public health and safety," and "includ[es]," as one example of such work, actions to "reduc[e] . . . immediate threats to life, property, and

---

[6] *See* DEA Memo at 3 ("Neither ESF-13 nor the Stafford Act appears to provide authority for [FLEOs] to enforce state laws."); DHS Memo at 4 ("[T]he Stafford Act contains no explicit provision authorizing [FLEOs] to make arrests and detentions in connection with violations of State criminal law in a manner other than in accordance with State or local law, such as State law regulating deputation."); FBI Memo at 3 ("We do not believe that the Stafford Act provides authority for federal law enforcement officials to make arrests in connection with an ESF-13 activation."); Forest Service Memo at 5 ("We have not interpreted [the Stafford Act] alone as authorizing Forest Service [law enforcement officers] to investigate or enforce violations of state criminal law."); USMS Memo at 2 n.4 ("[T]he 'Stafford Act' does not appear to provide for federal law enforcement assistance during national emergencies.").

public health and safety." 42 U.S.C. § 5170b(a)(3). It could be argued, for example, that in certain circumstances, FLEOs' enforcement of state criminal laws would be "essential" to saving lives and protecting public health and safety, and would "reduce" immediate threats to "life, property, and public health and safety." *Id.* As a result, these provisions could be read to confer some law enforcement authority, including arrest authority, on deployed FLEOs. But, as detailed above, arrest authority must be "conferred expressly," *Visa Fraud*, 8 Op. O.L.C. at 181, and the most one could say of these provisions is that the authority to enforce state criminal law, including through the making of arrests, may be inferred from them. In any event, the other examples of activities Congress expected federal agencies to perform, as listed in section 5170b(a)(3), include "debris removal," "search and rescue," "clearance of roads," and "demolition of unsafe structures." *Id.* These activities are different in kind from the enforcement of state criminal law, making it difficult to conclude that Congress intended the Stafford Act to authorize FLEOs to make arrests for state law violations. *See Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985) (noting "familiar principle of statutory construction that words grouped in a list should be given related meaning" (internal quotation marks omitted)).

## B.

The fact that neither ATF's organic statute nor the Stafford Act provides FLEOs with express authority to make arrests for state law violations does not end the analysis. As this Office explained in an opinion addressing the authority of FBI agents, although "agents may be without *Federal* authority to intervene in State offenses," state law may supply the necessary authority to act in certain circumstances. *FBI Jurisdiction*, 2 Op. O.L.C. at 47 (emphasis added). In particular, in the *FBI Jurisdiction* opinion, we identified state laws conferring arrest authority upon "private citizens" and "peace officers" as examples of laws that might authorize "FBI agents . . . in certain instances . . . to arrest those who have violated State or local law," depending upon their precise provisions. *Id.*

In neither the *FBI Jurisdiction* opinion nor subsequent advice have we identified state deputation laws as potential sources of authority for FLEOs to make state law arrests. We do not, however, see a material

difference between the peace officer and citizens' arrest provisions we have assessed in the past and state deputation laws generally. As we discuss below, during a Stafford Act deployment, it may often serve a federal purpose for FLEOs to make arrests for violations of state law. *See infra* p. 91. In that setting, the requirement that legislation expressly confer arrest authority on FLEOs, as well as that requirement's purpose—that the "awesome power," *Moore*, 754 F.2d at 1346, to arrest and detain be clearly assigned and delineated—will have been fulfilled if state law expressly authorizes FLEOs to make such arrests. In other words, there is no requirement that FLEOs' arrest authority come from a federal source, only that it be expressly conferred by a legislative act.

We therefore conclude that state deputation laws may provide FLEOs with the express authority to make arrests for violations of state criminal laws. You have not asked us about the scope of any particular state deputation law. As a result, we have not considered whether any such law would provide the requisite express authority. We emphasize, however, that whether a law confers express arrest authority in any given circumstance will depend on the details of the state law at issue, which may, for example, limit which federal officials may be deputized, or require that certain prerequisites be satisfied for deputation to be effective. *See FBI Jurisdiction*, 2 Op. O.L.C. at 49 ("The authority granted by the States to peace officers and private citizens to arrest without warrant may . . . vary from State to State."); *see, e.g.*, Okla. Stat. Ann. tit. 19, § 547 (West 2011) ("The sheriff or the undersheriff may in writing depute certain persons to do particular acts."); N.C. Gen. Stat. § 15A-406 (2010) (authorizing particular federal officers to enforce state criminal laws at the request of various state officials). As a result, when deployed pursuant to an ESF-13 mobilization, FLEOs should carefully review any relevant state deputation law (or other state authorizing laws) to determine whether any prerequisites to the state deputation exist, and to identify the scope of the authority granted.

## III.

The final dimension of our inquiry concerns whether federal appropriations law precludes FLEOs mobilized pursuant to the Stafford Act from making arrests authorized by state law. Even if FLEOs have been express-

ly authorized to make arrests for violations of state criminal law by state statutes, they cannot exercise that authority if doing so would contravene the federal Purpose Act. State law cannot authorize federal officers to make "expenditures that would be incurred in the course of" enforcing state law. *Police Killings*, 5 Op. O.L.C. at 49. As explained below, under the Constitution and applicable statutes, only Congress may authorize expenditures of federal funds. Unlike arrest authority itself, however, the authority to expend funds to make state law arrests need not be expressly conferred. Instead, FLEOs may exercise state-conferred arrest authority: (1) when they have been properly deployed under federal law; and (2) when the arrest would advance the purposes of that federally authorized deployment.

The Constitution directs that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Congress has adopted several statutes reflecting this constitutional principle, among them the Purpose Act, which the Comptroller General has described as "one of the cornerstones" of federal appropriations law. 1 General Accounting Office, *Principles of Federal Appropriations Law* 4-6 (3d ed. 2004) ("*Federal Appropriations Law*"). The Purpose Act provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). The Act reflects longstanding Supreme Court precedent under which it is an "established rule" that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976); *see also Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion.").

Equally well established, however, is the principle that the Purpose Act leaves federal agencies with "considerable discretion in determining whether expenditures further the agency's authorized purposes and therefore constitute proper use of general or lump-sum appropriations." *Employee Business Cards*, 21 Op. O.L.C. at 153. We have advised that, "'[i]f the agency believes that [an] expenditure bears a logical relation-

87

ship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission, the appropriation may be used,'" unless some "specific provision limits the amount that may be expended on a particular object or activity within [the] general appropriation." *Id.* at 153–54, 156 (quoting *Indemnification of DOJ Employees*, 10 Op. O.L.C. at 8); *see also Indemnification of Treasury Department Officers and Employees*, 15 Op. O.L.C. 57, 60 (1991) (an expenditure satisfies this doctrine if it "directly accomplishes the specific congressional purpose underlying the appropriation"; "incidentally accomplishes a specific congressional purpose"; or "is generally 'necessary' for the realization of broader agency objectives covered by the appropriation").

The Comptroller General has adopted a doctrine that mirrors this Office's standard. The Comptroller General will find an expenditure permissible as a necessary expense if the expenditure, among other things, "bear[s] a logical relationship to the appropriation sought to be charged," i.e., "it must make a direct contribution to carrying out either a specific appropriation or an authorized agency function for which more general appropriations are available." 1 *Federal Appropriations Law* at 4-21; *see also, e.g.*, *U.S. Commodity Futures Trading Commission—Availability of the Consumer Protection Fund*, B-321788, 2011 WL 3510145, at *3 (Comp. Gen. Aug. 8, 2011).[7] With respect to this "logical relationship" requirement, the Comptroller General has explained that it is not "essential" that a federal agency have "specific statutory authority" to make an expenditure. 1 *Federal Appropriations Law* at 4-26. If an expenditure "is directly connected with and is in furtherance of the purposes for which a particular appropriation has been made . . . the appropriation is available for the expenditure." *Id.*; *see also National Transportation Safety Board—Insurance for Employees Traveling on Official Business*, B-309715, 2007 WL 2792189, at *2 (Comp. Gen. Sept. 25, 2007) ("The necessary expense rule recognizes that when Congress makes an appropriation for a particular purpose, by

---

[7] The Comptroller General's test for necessary expenses also requires that the expenditure "not be prohibited by law" and "not be otherwise provided for, that is, it must not be an item that falls within the scope of some other appropriation or statutory funding scheme." 1 *Federal Appropriations Law* at 4-21 to 4-22. We have found no prohibition on the expenses that might be implicated here, and we discuss below the requirement that the expenditure not fall within the scope of some other appropriation. *See infra* note 12.

implication it authorizes the agency involved to incur expenses which are necessary or incident to the accomplishment of that purpose."); *Department of Homeland Security—Use of Management Directorate Appropriations to Pay Costs of Component Agencies*, B-307382, 2006 WL 2567514, at *3 (Comp. Gen. Sept. 5, 2006) ("Even if a particular expenditure is not specifically provided for in the appropriation, the expenditure may be permissible under the necessary expense doctrine if it will contribute materially to the effective accomplishment of the [agency] function.").[8]

To decide whether expenditures related to the exercise of state-conferred arrest authority would satisfy the "logical relationship" standard, we must first determine whether an appropriation is available to pay for such expenditures.[9] We find that an appropriation would be available in certain circumstances. Actions taken by FLEOs in the course of their deployment pursuant to the Stafford Act would likely be funded by the appropriations available for the "salaries and expenses" of ATF officers. Thus, for example, ATF's appropriation for "salaries and expenses" would be available to fund Stafford Act-related activity for which ATF officers were properly deployed. *See* Consolidated and Further Continuing

---

[8] Though not binding on Executive Branch agencies, "[t]he opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues." *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212, 216 n.3 (2000).

[9] In our *Police Killings* opinion, we interpreted the Purpose Act to limit FLEOs' exercise of authority to engage in state law enforcement activity, concluding that no matter how expansive the scope of authority conferred by state law, federal appropriations law would bar such officers from generally exercising that authority except "in an emergency situation" that "involve[s] no extraordinary expenses." 5 Op. O.LC. at 49 n.7 (citing *FBI Jurisdiction*). In the *FBI Jurisdiction* opinion, we defined such emergency situations as those in which a federal agent "witnesses, or is in the immediate vicinity of, [a state law] crime, and immediate action is required to detain or arrest the offender." 2 Op. O.L.C. at 47. But you have asked not whether FLEOs *generally* have authority to make arrests for state law violations, but instead whether FLEOs properly deployed under the Stafford Act may make arrests for state law offenses after they have been deputized under state laws. *See* Modified ATF Request at 1–2. Thus, the Purpose Act inquiry here differs from our inquiry in the *Police Killings* opinion because our analysis here turns on the logical relationship between the FLEOs' state law enforcement activity and the specific purposes of the federally authorized deployment of those FLEOs.

Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 609–10 (2011); *see also* 42 U.S.C. § 5170a(1) ("In any major disaster, the President may direct any Federal agency, with or without reimbursement, to utilize its authorities and the resources granted to it under Federal law . . . in support of State and local assistance response").[10]

We thus conclude that the funds appropriated for ATF salaries and expenses may be used for expenditures arising from arrests expressly authorized by state law and made by deputized ATF officers deployed under the Stafford Act, as long as such expenditures bear "a logical relationship to the objectives" of the Stafford Act deployment. *Indemnification of DOJ Employees*, 10 Op. O.L.C. at 8. Determining whether a logical relationship exists between an expenditure and the purposes of the Stafford Act will require an assessment of the factual circumstances that FLEOs encounter in connection with the disaster or emergency in question. ATF and appropriate Department of Justice officials will have to make the required determination based on the particular circumstances the ATF officers face during their deployment. *See Customs and Border Protection—Relocation Expenses*, B-306748, 2006 WL 1985415, at *3 (Comp. Gen. July 6, 2006) (noting the relevant agency "is in the best position to determine whether" an expenditure of funds is necessary to carry out the agency's mission effectively); *Department of the Air Force—Purchase of Decals for Installation on Public Utility Water Tower*, B-301367, 2003 WL 22416499, at *2 (Comp. Gen. Oct. 23, 2003) ("The application of the necessary expense rule, in the first instance, is a matter of agency discretion.").

In the context of some Stafford Act deployments, it may be clear from the outset that particular expenditures will directly further, and thus

---

[10] As DHS has explained to us, to fulfill its responsibilities under the Stafford Act, DHS "receives an appropriation known as the Disaster Relief Fund (DRF)." DHS Memo at 12. Pursuant to the Stafford Act, agencies other than DHS may seek reimbursement from the DRF for expenditures undertaken in the context of a Stafford Act deployment to "provide assistance essential to meeting immediate threats to life and property resulting from a major disaster," 42 U.S.C. § 5170b(a), including "any work or services essential to saving lives and protecting and preserving property or public health and safety," *id.* § 5170b(a)(3). But regardless of whether reimbursement from the DRF is sought, ATF's expenditures during a Stafford Act deployment would be covered in the first instance by its appropriation for salaries and expenses.

logically relate to and materially advance, the purposes of the relevant deployment. In enacting the Stafford Act, Congress found that "disasters often disrupt the normal functioning of governments and communities" and that "special measures, designed to aid the efforts of the affected States in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas, are necessary." 42 U.S.C. § 5121(a); *see id.* § 5121(b). Thus, for example, we think it likely that ATF could reasonably conclude that federal assistance in maintaining law and order by making arrests for violations of state criminal law in the aftermath of an emergency (as when FLEOs are deployed to prevent looting and maintain order in a populated area following a natural disaster) would advance those Stafford Act objectives.[11] It is also easy to envision situations in which state law arrests by FLEOs would be incident to or necessary to carry out an activity expressly authorized by the Stafford Act, such as "assist[ing] State and local government in the distribution of medicine, food, and other consumable supplies," *id.* § 5170a(4), or "[p]erforming . . . work or services essential to saving lives and protecting and preserving property or public health and safety," *id.* § 5170b(a)(3). *See also* DHS Memo at 13 (suggesting that state law arrests by deputized FLEOs would be "eligible for reimbursement from the [Disaster Relief Fund] because it furthers a specific purpose authorized by the Stafford Act—meeting an immediate threat to life and property").

## IV.

We underscore that appropriated funds are available to pay for ATF's exercise of state-conferred arrest authority only when FLEOs have been deployed pursuant to the Stafford Act to carry out a federal mission and are therefore in a position to make arrests for state law violations in the course of their deployment. Our analysis would not support the dispatch

---

[11] In light of this analysis, we need not determine whether arrests in the circumstances you have identified might fall within the exigent circumstances exception discussed in our *FBI Jurisdiction* opinion, *see supra* note 9. If the relevant FLEOs have been deputized by a state law that expressly confers arrest authority, and if the arrests you describe will advance the objectives of the relevant Stafford Act deployment, there is no need to invoke exigent circumstances to support arrest authority.

of FLEOs to make arrests for state law violations in the absence of a valid Stafford Act deployment. *See supra* note 9. We conclude only that, where FLEOs have been deployed pursuant to the Stafford Act and are properly carrying out federal disaster relief in a local community, FLEOs may accept deputation under state laws that expressly authorize them to make state law arrests, where such arrests would bear a logical relationship to or advance the purposes of the Stafford Act deployment.[12]

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*

---

[12] As noted above, *see supra* pp. 87–88, this Office has indicated that a general appropriation may not be used if some "specific provision limits the amount that may be expended on a particular object or activity within [the] general appropriation." *Employee Business Cards*, 21 Op. O.L.C. at 156 (quoting *Indemnification of DOJ Employees*, 10 Op. O.L.C. at 8). Similarly, under the Comptroller General's formulation of the doctrine, "the existence of a more specific source of funds, or a more specific statutory mechanism for getting them," can "override[] the 'necessary expense' considerations." 1 *Federal Appropriations Law* at 4-30; *see also supra* note 8.

We previously observed that another federal statute, EFLEA, may be relevant to FLEOs' authority to make arrests for violations of state criminal laws in the specific law enforcement emergencies that EFLEA identifies. *See supra* p. 81. This raises the potential concern that, where EFLEA applies, funds appropriated under EFLEA must be used for deployments, and invocation of the necessary expense doctrine in relation to the Stafford Act would be precluded. In fact, however, Congress has clearly indicated that EFLEA is not exclusive, even where it applies, and therefore that EFLEA does not limit the President's authority to provide emergency assistance under the Stafford Act. *See* 42 U.S.C. § 10503(e) ("Nothing" in EFLEA should "be construed to limit any authority to provide emergency assistance otherwise provided by law."). Thus, the President may always elect to respond to emergencies under the Stafford Act, using appropriated funds that are available to further the purposes of Stafford Act deployments. *Cf. Securities and Exchange Commission—Supplemental Appropriation*, B-322062, 2011 WL 6076288, at *3 (Comp. Gen. Dec. 5, 2011) ("where one appropriation clearly supplements another appropriation, then both appropriations may be used for the same purpose").